**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **TAMI JAKEL**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**SONITOR TECHNOLOGIES, INC.** and **SANFORD HEALTH NETWORK**,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Tami Jakel ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this class action Complaint against Defendants Sonitor Technologies, Inc. ("Sonitor") and Sanford Health Network ("Sanford") (collectively, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' collective failures to protect highly sensitive data.

2. Defendant Sonitor is a healthcare technology company that develops real-time location systems (RTLS) and workflow automation software that enable

hospitals to track patients, staff, medical equipment, and other assets indoors to improve operational efficiency, patient flow, and safety.[1]

3. Defendant Sanford is an integrated health system that provides comprehensive medical care, specialty services, health insurance, and research across hospitals, clinics, and other healthcare facilities throughout the Midwest and surrounding regions.[2]

4. Based on a case study published to Sonitor's website on November 23, 2022, Defendant Sanford used Defendant Sonitor's RTLS platform to automate patient tracking and nursing workflows, improving patient flow, increasing staff efficiency, and enhancing patient safety through real-time location intelligence.[3]

5. As such, each Defendant stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about their patients and employees. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

6. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the Data Breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches

[1] *About Sonitor*, SONITOR, https://sonitor.com/about/.
[2] *About Us*, SANFORD HEALTH, https://www.sanfordhealth.org/about.
[3] *Sanford Health*, SONITOR, https://sonitor.com/case-studies/sanford-health/.

of their systems—thereby allowing cybercriminals unrestricted access to their patients' and employees' PII/PHI.

7. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, each Defendant's collective failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

8. Each Defendant independently owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant Sonitor, as the entity entrusted with Protected Health Information, and operator of the technology platform storing and processing Plaintiff's Private Information, owed duties under HIPAA and common law to implement and maintain adequate cybersecurity measures. Defendant Sanford Health as the healthcare entity who selected Sonitor and directed that sensitive data be provided to Sonitor, owed duties to properly vet, monitor, and supervise its third-party vendors. Both Defendants solicited, collected, used, and derived a benefit from the Private Information, yet each breached its respective duties by failing to implement or maintain adequate security practices.

9. Plaintiff is a Data Breach victim. She brings this class action on behalf of herself, and all others harmed by Defendants' misconduct.

10. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, their patients' and employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

11. Plaintiff is a natural person and a citizen of Illinois. She is domiciled in Illinois, where she intends to remain.

12. Defendant Sonitor Technologies, Inc. is a corporation formed in Florida, with its principal place of business at 1850 Cypress Lake Drive, Suite 350, Orlando, Florida 32837.

13. Defendant Sanford Health Network is a domestic nonprofit corporation formed in South Dakota, with its principal place of business at 1305 W. 18th St., Sioux Falls, South Dakota 57105.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Minimal diversity exists because Plaintiff is a citizen of a State different from at least one Defendant. And there are

over 100 putative Class Members.

15. This Court has personal jurisdiction over Defendant Sonitor because is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida. This Court also has personal jurisdiction over Defendant Sanford because it uses and contracts for services provided by Defendant Sonitor, including services that are relevant to the claims asserted in this action, thereby establishing sufficient contacts with this District related to the claims at issue.

16. Venue is proper in this Court because Defendant Sonitor's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII/PHI of Plaintiff and the Class***

17. Defendant Sonitor is a healthcare technology company that develops real-time location systems (RTLS) and workflow automation software that enable hospitals to track patients, staff, medical equipment, and other assets indoors to improve operational efficiency, patient flow, and safety.[4]

18. Defendant Sanford is an integrated health system that provides comprehensive medical care, specialty services, health insurance, and research

---

[4] *About Sonitor*, SONITOR, https://sonitor.com/about/.

across hospitals, clinics, and other healthcare facilities throughout the Midwest and surrounding regions.[5]

19. Based on a case study published to Sonitor's website on November 23, 2022, Defendant Sanford used Defendant Sonitor's RTLS platform to automate patient tracking and nursing workflows, improving patient flow, increasing staff efficiency, and enhancing patient safety through real-time location intelligence.[6]

20. As part of their business, each Defendant respectively receives and maintains the PII/PHI of thousands of their patients and employees.

21. In collecting and maintaining the PII/PHI, each Defendant agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII/PHI.

22. Under state and federal law, businesses like Defendants have duties to protect their patients' and employees' PII/PHI and to notify them about breaches.

23. Defendant Sonitor recognizes these duties, declaring in its "Privacy Policy" that:

a. "The security of your Personal Information is important to us."[7]

---

[5] *About Us*, SANFORD HEALTH, https://www.sanfordhealth.org/about.
[6] *Sanford Health*, SONITOR, https://sonitor.com/case-studies/sanford-health/.
[7] *Privacy Policy*, SONITOR, https://sonitor.com/privacy-policy-website/.

b. "We will disclose your Personal Information where required to do so by law or subpoena."[8]

c. "We will not use or share your information with anyone except as described in this Privacy Policy."[9]

24. Defendant Sanford recognizes these duties, declaring in its "Privacy Statement" that:

a. "Sanford Health acknowledges and respects any individual's right to privacy. We take your concerns related to privacy and security seriously."[10]

b. "We will retain your information for as long as needed to provide you services, comply with our legal obligations, resolve disputes, and enforce our agreements."[11]

c. "Sanford Health provides reasonable and appropriate security measures to protect our website content and any personal information you may provide against foreseeable hazards. When you enter sensitive information (such as a credit card number) on our forms, we encrypt the transmission of that information using secure

---

[8] *Id.*
[9] *Id.*
[10] *Privacy Statement*, SANFORD HEALTH, https://www.sanfordhealth.org/privacy-statement.
[11] *Id.*

> socket layer technology (SSL). When you come across a web page that is secured, your browser will likely display a 'closed lock' or other symbol to inform you that SSL has been enabled. The web address should start with 'https://" rather than "http://'. SSL allows a secure connection between your web browser and a web server."[12]

***Defendants' Data Breach***

25. On or around July 7, 2026, Defendant Sonitor was hacked in the Data Breach.[13]

26. Worryingly, a ransomware monitoring group published a notification attributing responsibility for the Data Breach to a group known as "PEAR."[14]

27. On information and belief, PEAR maintains a Data Leak Site ("DLS") on the dark web where it publishes stolen data in order to pressure organizations that were subject to a data breach. On or around July 30, 2026, PEAR created a post on its dark web DLS stating that it had hacked Defendant.[15]

28. PEAR's dark web post contained Defendant Sonitor's name, logo, description, revenue, a link to Defendant Sonitor's website, and samples of

---

[12] *Id.*
[13] *Sonitor Technologies*, RANSOMWARE.LIVE, https://www.ransomware.live/id/U29uaXRvciBUZWNobm9sb2dpZXNAcGVhcg.
[14] *Id.*; *see also Pear Launches Ransomware Attack on Sonitor Technologies*, DEXPOSE, https://www.dexpose.io/pear-launches-ransomware-attack-on-sonitor-technologies/.
[15] *Id.*

unredacted victim data below Defendant's description.

29. PEAR has reportedly leaked 560 of sensitive data, including, "Financials, HR, PII & PHI records, Business Operations, Partners and Vendors Data, Clients' and Customers' Private Data, Multiple Technical and Developments Data, Source Code, Mailboxes & Email Correspondence, Databases, etc."[16]

30. This indicates that PEAR hacked Defendant Sonitor's computer network, stole the sensitive PII/PHI contained therein, and published the stolen PII/PHI on the dark web.

31. Because of Defendants' Data Breach, at least the following types of PII/PHI were compromised:

a. Name;

b. Date of birth;

c. Social Security number;

d. Financial information;

e. Driver's license information; and

f. Healthcare information.

32. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendants' custody and control. And upon information and belief,

---

[16] *Id.*

the putative Class is over one hundred members—as it includes their patients and employees.

33. And yet, neither Defendant has notified the Class.

34. Upon information and belief, neither Defendant has yet to send individualized notice letters to victims of the Data Breach and does not have mailing information for all individuals who are victims of the Data Breach.

35. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

36. Each Defendant failed their respective duties when their inadequate security practices caused the Data Breach. In other words, each Defendant's respective negligence is evidenced by their individual failures to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendants caused widespread injury and monetary damages.

37. Defendant Sonitor had this duty as the entity entrusted with Plaintiff's healthcare-related Private Information, and as the operator of the systems storing such information.

38. Defendant Sanford Health had this duty as the healthcare entity who initially collected Plaintiff's and Class Members' Private Information, selected Sonitor as a vendor, and entrusted Plaintiff's and Class Members' Private Information to Sonitor.

39. Defendants have done little to remedy their Data Breach.

40. Because of Defendants' Data Breach, the sensitive PII/PHI of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***PEAR & the Dark Web***

41. Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII/PHI appear to be the notorious cybercriminal group "PEAR."[17]

42. PEAR is an especially notorious cybercriminal group. In fact, ransomware monitoring groups have stated that PEAR has already had at least 107 victims.[18]

43. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals like PEAR is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[19]

44. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to

---

[17] *Pear Launches Ransomware Attack on Sonitor Technologies*, DEXPOSE, https://www.dexpose.io/pear-launches-ransomware-attack-on-sonitor-technologies/; *Sonitor Technologies*, RANSOMWARE.LIVE, https://www.ransomware.live/id/U29uaXRvciBUZWNobm9sb2dpZXNAcGVhcg.

[18] *Id.*

[19] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

commit fraud, get fake identity documents, or fund their criminal organizations."[20]

45. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully acquired data.

46. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[21]

47. Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

***Plaintiff's Experiences and Injuries***

48. Plaintiff is a former patient of Defendant Sanford Health.

49. Thus, Defendants obtained and maintained Plaintiff's highly

---

[20] John Krebs, *The dark web: What your business needs to know*, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

[21] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

sensitive PII/PHI, including at the time of the Data Breach.

50. As a result, Plaintiff was injured by Defendants' Data Breach.

51. Plaintiff is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

52. Plaintiff provided her PII/PHI to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII/PHI and have a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

53. Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII/PHI.

54. Through their Data Breach, Defendants compromised Plaintiff's PII/PHI.

55. Plaintiff has spent—and will continue to spend—significant time and effort monitoring their accounts to protect herself from identity theft.

56. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

57. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

58. Plaintiff suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

59. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendants were required to adequately protect.

60. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

61. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate her injuries.

62. Today, Plaintiff has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

63. In 2024, the technology and communications conglomerate Cisco

published the results of its multi-year "Consumer Privacy Survey."[22] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[23]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[24]

c. 89% of consumers stated that "I care about data privacy."[25]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[26]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[27]

---

[22] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf.
[23] *Id*. at 3.
[24] *Id*.
[25] *Id*. at 9.
[26] *Id*.
[27] *Id*.

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[28]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

64. Because of each Defendant's respective failures to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendants' possession—and is thus at risk for future breaches so long as

[28] *Id*. at 11.

Defendants fails to take appropriate measures to protect the PII/PHI.

***Substantially Increased Risk of Identity Theft and Fraud***

65. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

66. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

67. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

68. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

69. The "dark web" is an unindexed layer of the internet that requires

special software or authentication to access.[29] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[30] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

70. The unencrypted PII/PHI of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII/PHI.

71. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has

---

[29] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/.
[30] *Id*.

suffered the harm.

72. In particular, the theft of Social Security numbers—in combination with other PII/PHI (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

73. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[31] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[32]

74. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when

---

[31] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[32] *Id.*

an individual's authentic tax return is rejected.

75. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[33]

76. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

77. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

78. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data

---

[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

79. Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[34]

80. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[35] These dossiers are both shockingly accurate and

[34] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication

comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

81. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other Class

---

details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

82. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[36]

83. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

84. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

85. In addition to out-of-pocket expenses that can exceed thousands of

---

[36] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

86. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

87. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

88. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[37]

89. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report

[37] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[38]

90. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[39]

91. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Could Have Prevented the Data Breach***

92. Data breaches are preventable.[40] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[41]

---

[38] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[39] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[40] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[41] *Id.* at 17.

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[42]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [43]

93. To prevent and detect the attack here, Defendants could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures:

a. Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance

[42] *Id.* at 28.
[43] *Id.*

(DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configured firewalls to block access to known malicious IP addresses.

e. Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft

Office files transmitted via email instead of full office suite applications.

j. Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k. Considered disabling Remote Desktop protocol (RDP) if it is not being used.

l. Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Executed operating system environments or specific programs in a virtualized environment.

n. Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[44]

94. According to information and belief, Defendants failed to do any of the above.

---

[44] *Id.* at 3–4.

95. To prevent and detect cyberattacks, Defendants could and should have recommended its employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, take the following measures:

a. **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

b. **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

c. **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d. **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.

e. **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f. **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g. **Used and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them

updated—to reduce malicious network traffic.[45]

96. In addition, to prevent and detect the Data Breach Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Harden internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
- **Thoroughly investigate and remediate alerts.**
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- **Include IT professionals in security discussions.**
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely
- **Build and maintain credential hygiene**
  - Use multifactor authentication or network level

[45] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

authentication and enforce strong, randomized, just-in-time local administrator passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[46]

97. Specifically, among other failures, Defendants had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[47]

---

[46] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[47] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

98. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[48]

99. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[49] Rather than following this basic standard of care, Defendant kept thousands of individuals' unencrypted Private Information on its inadequately secured systems indefinitely.

100. In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation, redaction, and encryption of all Private Information—which Defendants negligently failed to do.

101. Further, the scope of the Data Breach could have been dramatically reduced had Defendants utilized proper record retention and destruction practices—but Defendants negligently did no such thing.

---

[48] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[49] *Id.* at 6.

***Defendants Failed to Follow FTC Guidelines***

102. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

103. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[50] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

104. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[50] *Protecting Personal Information: A Guide for Business*, FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

105. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

106. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

107. In short, each Defendant's respective failures to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information, including Sanford Health's failure to properly vet, monitor, and supervise Sonitor, and Sonitor's failure to secure the

systems where the Private Information was stored, constitute an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

108. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

109. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

110. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01,

DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

111. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

***Defendants Violated HIPAA***

112. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[51]

113. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[52]

114. The Data Breach resulted from a combination of inadequacies

[51] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[52] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. §

164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

115. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

***Diminished Value of Private Information***

116. Personal data like Private Information is a valuable property right.[53]

[53] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

117. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

118. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[54]

119. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[55] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[56]

120. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[57] Criminals can also purchase access to entire company data breaches from

---

[54] Shadowy data brokers make the most of their invisibility cloak (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[55] The Personal Data Revolutaion, DATA COUP, https://datacoup.com/ and How it Works, DIGI.ME, https://digi.me/what-is-digime/ (last visited Aug. 13, 2026).
[56] Frequently Asked Questions, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.
[57] *Id.*

$900 to $4,500.[58]

121. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[59]

122. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

123. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

## CLASS ACTION ALLEGATIONS

124. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2),

---

[58] Bryan Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[59] 2019 Internet Crime Report Released, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion.

and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach affecting Defendants in July 2026.

125. Excluded from the Class are Defendants, their affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

126. Plaintiff reserves the right to amend the class definition.

127. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

128. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

129. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least hundreds of members.

130. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data

Breach.

131. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

132. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendants breached contract promises to safeguard Plaintiff's and the Class's PII/PHI;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

133. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

134. Plaintiff incorporates by reference paragraphs 1–133 as if fully set forth herein.

135. Plaintiff and the Class (or their third-party agents) entrusted their PII/PHI to Defendants on the premise and with the understanding that Defendants would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

136. Each Defendant independently owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

137. Defendant Sonitor, as the technology platform operator entrusted with sensitive information had a duty to implement cybersecurity controls and intrusion detection systems.

138. Defendant Sanford Health, as the healthcare entity who selected and directed use of Sonitor as a vendor, had a duty to conduct due diligence and ongoing oversight of Sonitor's security practices.

139. Each Defendant independently has full knowledge of the sensitivity

of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

140. Each Defendant independently owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII/PHI.

141. Each Defendant independently owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in their care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

142. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach.

After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

143. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

144. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

145. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII/PHI, a necessary part of obtaining services from Defendants.

146. Under the FTC Act, 15 U.S.C. § 45, each Defendant independently had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII/PHI.

147. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting

commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the Class Members' sensitive PII/PHI.

148. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

149. Similarly, under HIPAA, Defendants each had a respective duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class Members' PHI.

150. Each Defendant independently violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, each Defendant's respective conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data

breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

151. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendants hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII/PHI —whether by malware or otherwise.

152. PII/PHI is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

153. Defendants improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

154. Each Defendant independently breached these duties as evidenced by the Data Breach.

155. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

156. Defendants breached their respective duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class Members, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury.

157. Each Defendant further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

158. As a direct and traceable result of each Defendant's respective negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

159. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

160. Defendants' breach of their common-law duties to exercise

reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

161. Plaintiff incorporates by reference paragraphs 1–133 as if fully set forth herein.

162. Plaintiff and the Class directly or indirectly entrusted their Private Information to Defendant Sanford Health in connection with the services Defendant Sanford Health provides. In so doing, Plaintiff and the Class entered into implied contracts with Defendant Sanford Health by which Defendant Sanford Health agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

163. At the time Defendant Sanford Health acquired the Private

Information of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendant Sanford Health would safeguard the Private Information and not take unjustified risks when storing the Private Information.

164. Implicit in the agreements between Plaintiff and Class Members and Defendant Sanford Health to provide Private Information was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

165. Plaintiff and the Class would not have entrusted their Private Information to Defendant Sanford Health had they known that Defendant would make the Private Information internet-accessible, not encrypt sensitive data elements, and not delete the Private Information when Defendant Sanford Health no longer had a reasonable need to maintain it.

166. Plaintiff and the Class fully performed their obligations under the

implied contracts with Defendant Sanford Health.

167. Defendant Sanford Health breached the implied contracts it made with Plaintiff and the Class by failing to adequately vet, monitor, and supervise its third-party vendor, safeguard and protect their personal information, by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

168. As a direct and proximate result of Defendant Sanford Health's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

169. As a direct and proximate result of Defendant Sanford Health's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

**<u>COUNT III</u>**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiff and the Class)**

170. Plaintiff incorporates by reference paragraphs 1–133 as if fully set forth herein.

171. On information and belief, Defendants Sanford Health and Sonitor entered into contracts with each other to the benefit of Plaintiff and Class Members.

172. Plaintiff and the Proposed Class Members are third-party beneficiaries of the contracts between Defendants Sanford Health and Sonitor, under which D Defendants Sanford Health and Sonitor received Plaintiff's and the Class Members' Private Information and stored that information in their computer network systems.

173. On information and belief, these contracts are virtually identical and were made expressly for the benefit of Plaintiff and Class Members, in that the contracts all related to the provision of services to Plaintiff and the Class.

174. Each Defendant knew that if it were to breach these contracts, Plaintiff and Class Members would be harmed.

175. Defendant Sanford Health knew that its patients and other individuals who provided their Private Information to Sanford Health would be harmed if the vendor it selected failed to safeguard their Private Information.

176. Defendant Sonitor knew that Sanford Health's patients and those who provided information to Sanford Health, would be harmed if it failed to safeguard their Private Information.

177. Defendants breached the foregoing contracts by failing to adequately protect Plaintiff's and the Class Members' Private Information, resulting in the Data Breach, and injury-in-fact and damages.

178. Defendants each materially breached the contract(s) each had entered into by failing to safeguard the Private Information entrusted to them, including by Defendant Sanford Health failing to properly supervise third-party vendor Defendant Sonitor to ensure it safeguarded Plaintiff's and Class Members' Private Information. These collective failures by Defendants amounted to breaches of the covenant of good faith and fair dealing.

179. Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, including actual, consequential, and nominal damages, along with costs and attorneys' fees incurred in this action.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

180. Plaintiff incorporates by reference paragraphs 1–133 as if fully set forth herein.

181. This claim is pleaded in the alternative to the breach of implied

contract claim.

182. Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII/PHI to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit.

183. Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

184. Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

185. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII/PHI.

186. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

187. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII/PHI and (2) employment and/or payment because Defendants failed to adequately protect their PII/PHI.

188. Plaintiff and Class Members have no adequate remedy at law.

189. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**COUNT V**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

190. Plaintiff incorporates by reference paragraphs 1–133 as if fully set forth herein.

191. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

192. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiff allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer

injury from the ongoing threat of fraud and identity theft.

193. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendants breach of their duties caused—and continues to cause—injuries to Plaintiff and Class Members.

194. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

195. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

196. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the

same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

197. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

198. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable

compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

## CERTIFICATION UNDER PENALTY OF PERJURY THAT ARTIFICIAL INTELLIGENCE WAS NOT USED IN THE PREPARATION OF THIS FILING

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. After diligent inquiry and under penalty of perjury, I certify that artificial intelligence was not utilized in the preparation of this filing in any way. I understand that, whether I represent myself or I am an attorney representing a client, I have an affirmative obligation to read each case cited in this filing. If I fail to do so and a case upon which I rely does not exist or does not reasonably stand for the cited proposition, I understand that the Court may treat

this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

Dated: August 13, 2026

Respectfully submitted,

By: *<u>/s/ Jonathan Streisfeld</u>*

Jonathan Streisfeld (FBN 117447)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
streisfeld@kolawyers.com

*Attorney for Plaintiff and Proposed Class*